Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Andrew J. Somers, #19078
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
andrew@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALISON G., individually and on behalf of O.G. a minor,<br><br>            Plaintiff,<br><br>vs.<br><br>KAISER PERMANENTE, CARELON BEHAVIORAL HEALTH f/k/a BEACON HEALTH OPTIONS, and ROCKY MOUNTAIN HUMAN SERVICES a/k/a DENVER OPTIONS INC.,<br><br>            Defendants. | COMPLAINT<br><br>Civil Case No. 2:24-cv-00878 |

Plaintiff Alison G. ("Alison"), individually and on behalf of O.G. a minor, through her

undersigned counsel, complains and alleges against Defendants Kaiser Permanente ("Kaiser"),

Carelon Behavioral Health f/k/a Beacon Health Options ("Beacon"), and Rocky Mountain

Human Services a/k/a Denver Options Inc (the "Plan Administrator") as follows:

//

1

## PARTIES, JURISDICTION AND VENUE

1. Alison and O.G. are natural persons residing in El Paso County, Colorado. Alison is O.G.'s mother.

2. Kaiser is a California based insurance company and Beacon is based out of Massachusetts. Kaiser was the insurer and claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case. Kaiser contracted with Beacon to process appeals on its behalf, and Beacon was the entity that denied payment for O.G.'s treatment.

3. At all relevant times Kaiser acted as agent for the insurance plan ("the Plan") providing coverage for Alison and O.G.

4. The Plan Administrator is the designated administrator for the Plan.

5. The Plan is a fully insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Alison was a participant in the Plan and O.G. was a beneficiary of the Plan at all relevant times. Alison and O.G. continue to be participants and beneficiaries of the Plan.

6. O.G. received medical care and treatment at Red Mountain Colorado ("RMC") from November 25, 2022, to May 26, 2023. During the timeframe at issue, RMC was a treatment facility located in Colorado, which provided sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

7. Kaiser and Beacon denied claims for payment of O.G.'s medical expenses in connection with his treatment at RMC.

8. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, and because Kaiser and Beacon do business in Utah.

10. In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs she will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both Alison and O.G.'s privacy will be preserved.

11. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against the Plan Administrator pursuant to 29 U.S.C. §1132(c) based on the failure of the Plan Administrator and its agents to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

//

//

//

//

//

## BACKGROUND FACTS

### O.G.'s Developmental History and Medical Background

12. Around the time that he was in the fifth grade, O.G. started exhibiting body-focused repetitive behaviors such as trichotillomania[1] and pricking his legs. O.G. was able to lessen these behaviors somewhat by utilizing fidget toys and similar items to distract him and keep his hands busy.

13. O.G. stated that he was experiencing anxiety and depression and started seeing a therapist. O.G. did not cope well with the restrictions put in place during the Covid-19 pandemic and would frequently lash out such as by punching holes in walls and doors.

14. After a performance in the school play, O.G. had an emotional breakdown and started to cry. O.G. increasingly isolated himself and had an increase in depressive symptoms. He refused to maintain his hygiene and stated that he was having visual and auditory hallucinations.

15. In September of 2020, an anonymous report from a peer about O.G. saying "dark things" led to a visit from the school social worker. O.G. was also found to be shoplifting around this time. He stated that he didn't need the things he stole but liked the thrill of it.

16. O.G. continued to experience hallucinations and was diagnosed with major depressive disorder with psychotic features. O.G.'s medications were changed. This was initially helpful, but he regressed after he stopped takin his medications. O.G. was diagnosed with a mid-range spectrum psychotic disorder.

---

[1] Trichotillomania is a condition where the affected individual compulsively pulls out their own hair, typically on the head and eyelashes.

17. When he was in the ninth grade, O.G. was suspended from school for two days after he was found to be drunk on vodka at a school dance. O.G.'s room was then searched and additional alcohol was found along with incense and cigarettes.

18. O.G.'s parents received concerned calls after O.G. made some comments on social media about school shootings. O.G. stated that he didn't expect to live past twenty and on November 12, 2021, he attempted suicide by overdosing on one of his prescriptions while smoking a pack of cigarettes.

19. O.G. was hospitalized and his medications were adjusted. On discharge, O.G. started meeting with a new therapist. He continued to report hallucinations and stopped taking any care of his hygiene.

20. O.G. would have meltdowns over seemingly minor issues and started showing signs of mania such as pacing in class or refusing to sleep. He was often oppositional and was found to be "huffing" chemicals like hairspray and spray paint. O.G. would frequently vomit or pass out due to his substance abuse.

21. On one occasion when his mother took away his cigarettes, O.G. became enraged, physically assaulted his parents, tried to grab the lockbox full of medications, and then jumped out of the window, leaving home in a snowstorm with no shoes, pants, and a ripped shirt. Eventually he returned but stated that he was unable to recall the incident the next day.

22. O.G.'s treatment team told his parents that the therapy he was receiving would not be effective while O.G.'s substance use was not under control. A few days later, O.G.'s parents discovered paint that he had been using to get high in the sink, when confronted

he became angry and left the house stating that "this weekend you and mom will feel my pain."

23. On February 8, 2022, O.G. told Alison that he was not in a good place and had a plan for suicide by drinking weed killer. O.G. was taken to the hospital, but no beds were available and so he was placed on a psychiatric hold in another facility until a hospital bed was found. A little over a week later, O.G. was discharged to an intensive outpatient program, but he refused to go after his first session.

24. O.G. started giving himself "stick-and-poke" tattoos. On February 20, 2022, Alison found him in a delusional state. He claimed he didn't recognize her and then admitted to taking large quantities of Benadryl which he had stolen. O.G. was again hospitalized. He tried to run away while there and had to be placed in a hold and sedated.

25. On release, O.G. continued to isolate and use substances in his room. A few days afterwards he told Alison that he wished she would go ahead and slit her wrists open with a box cutter and die. O.G. then told his father that he wished he had a heart attack and died so that O.G. could do drugs in peace.

26. O.G. was angry and threatening at school and was again taken to the hospital by the police after running away from home. O.G. was found to be using Kratom and refusing to take his prescribed medications. This caused him to enter a manic state during which he broke things around the house and attacked his father, leading to another police encounter.

27. O.G. self-harmed via cutting, missed appointments, refused treatment, slept most of the day or not at all, would steal money, and was physically combative. O.G.'s parents attempted to implement a "reset plan" with goals for therapy, school attendance,

socialization and exercise. When O.G. found out about this, he became combative and started kicking holes in things. O.G. left home and was brought home by the police. He was then sent to an outdoor behavioral health program called Second Nature, after which he was admitted to RMC.

### RMC

28. O.G. was admitted to RMC on November 25, 2022, on the recommendation of his treatment team.

29. In a letter dated December 8, 2022, Beacon denied payment for O.G.'s treatment at RMC. The letter stated that payment was being denied as:

> You are [sic] 15-year-old male for whom admission was requested to residential mental health treatment on 11/25/2022, due to impulsive behaviors. Upon admission, your symptoms included anxiety, a history of self-harm behaviors, and substance use. Based on the information provided, you were calm and cooperative. You were sober. You were not engaging in any self-harm behaviors. You did not have any behavioral or mental health concerns that required 24-hour a day support. Your family was supportive. On 11/25/2022, it was not medically necessary for your symptoms to be managed with residential mental health treatment. Your care could have been safely addressed in a less restrictive level of care, such as intensive outpatient mental health treatment. This would include individual therapy and medication management.

30. On February 3, 2023, Alison submitted an appeal of the denial of payment for O.G.'s treatment. Alison wrote that while O.G. had initially been able to receive outpatient care, the increasingly debilitating symptoms he was experiencing due to his bipolar disorder and other comorbid symptoms prevented further outpatient treatment from being an effective option.

31. Alison recounted incidents in O.G.'s past leading up to his admission at RMC, including an attempted suicide by overdose in November of 2021 which resulted in a six-day hospitalization, another hospitalization in February of 2022, after O.G. again threatened

to kill himself, a third hospitalization also in February of 2022 after taking multiple boxes of Benadryl, and a fourth hospitalization in March of 2022.

32. In addition, she wrote that O.G. struggled with substance use, food restricting, not taking care of his daily needs such as hygiene, medication refusal, self-harm, school refusal, and isolation.

33. Alison argued that O.G. had a pattern of acute hospitalizations that would not have stopped without appropriate measures being taken. She wrote that early intervention was especially important given O.G.'s diagnosis of bipolar disorder and the difficulty of treating this condition. She wrote that RMC was the first facility where O.G. was invested and progressing in his treatment.

34. In a letter dated February 28, 2023, Beacon upheld the denial of payment for O.G.'s treatment. The reviewer[2] gave the following justification for upholding the denial:

> You are a 15-year-old individual who was admitted to residential mental health treatment on 11/25/2022, due to behavioral concerns. Based on the provided information, you had been struggling with disordered eating, self-injurious behaviors, lashing out, and substance use during the past year. Evidence shows that you had just completed treatment, and at the time of your admission assessment, your mood was stable. You were not engaging in self-injurious behaviors. Your thoughts were clear. You had not been using substances and you were motivated to remain abstinent. You were taking your prescribed medications. You did not have any behavioral or mental health concerns that required 24-hour a day support. Therefore, as of 11/25/2022, it was not medically necessary to manage your symptoms and behaviors with residential mental health treatment. Your care could have been safely addressed with partial hospitalization mental health treatment, which typically meets 5 days a week, for 6 hours each day.

---

[2] The letter was signed by Gary Proctor MD., the same individual who signed the initial denial letter. It is not apparent whether Dr. Proctor conducted both reviews despite ERISA's claims procedure regulations which prohibits this practice, or whether he simply signed both letters.

35. On June 8, 2023, Alison asked for the denial of payment to be evaluated by an external review agency. She argued that Beacon had failed to uphold its obligations under ERISA during the review process and had not meaningfully responded to the arguments she made in her appeal.

36. She contended that Beacon had "made a series of conclusory statements" without citing to any clinical evidence to support its denials and its denial letters did not reference any requirements in the criteria it claimed to have used which had allegedly not been met, nor did it make any references to O.G.'s medical records. She questioned how thoroughly Beacon had reviewed her appeal, if it even had at all.

37. She asked the reviewer to thoroughly review all the information she provided and to make specific references to any requirements which supported this decision, whether met or not met, along with references to any supporting clinical documentation which supported the reviewer's determination.

38. She wrote that Beacon appeared to be violating generally accepted standards of medical practice by requiring acute level symptoms for a patient in need of a subacute level of care. She argued that this conflicted with generally accepted standards of medical practice and the actual terms of the Plan.

39. Alison stated that O.G.'s treatment was the most appropriate level of care that could safely and effectively treat his conditions, especially given his history of regression and high-risk behaviors at lower levels of care.

40. She shared copies of O.G.'s medical records as well as letters of medical necessity with the appeal. In a letter dated January 9, 2023, Maren Boehnke, MD, wrote in part:

[O.G.] is a patient at our medical practice. He has been diagnosed with major depression with psychotic features which has required both inpatient and day treatment programs to address. He has been suffering from substance missuse [sic] and mood disorders. He required residential stays for treatment due to his severe features as well as physical size. As a post-pubescent adolescent, he cannot be physically moved to treatment at home if he decides against, but in a residential facility care can be brought to him. His admission to residential treatment is medically necessary to treat his substance abuse and mood disorders.

41. Officer Amanda Strider wrote in part in a letter dated May 4, 2003:

I am currently the School Resource Officer for Manitou Springs School District 14 and was employed as such during the 2021-2022 school year when [O.G.] was a freshman. During this time, I had many occasions to interact with [O.G.] at school, in his home, and within the community.

While [O.G.] was attending Manitou Springs High School, his mental health was severely dysregulated, which manifested itself in multiple ways that were medically unsafe for [O.G.] and others around him. [O.G.] was self-medicating with drugs, household substances, and alcohol, which resulted in symptoms of depression, anxiety, and psychosis. He was actively suicidal. I responded to his home at one point for a suicidal check the welfare after a Safe2Tell tip was submitted. [O.G.] was in his bathtub after overdosing on his prescription medication. He had a written a suicide note to his parents that he taped to the bathroom door. He was given activated charcoal and transported to the hospital.

Even with four crisis hospitalizations, the violence towards himself and his parents at home increased, which resulted in multiple interactions with the police. I responded to a call for service in which [O.G.] had physically attacked his father and then fled the home. I found him walking alone in his neighborhood, crying hysterically. He told me he wished his brain would stop "buzzing" and he really did need help getting better. Officers responded on another occasion after [O.G.] had cut himself and was walking down the street actively bleeding.

At school, [O.G.] made students uncomfortable through his odd and erratic moods and interests to include mass killers. This resulted in a daily check-in and search of [O.G.]'s backpack before school started. School counselors, teachers, and social workers frequently came to me expressing their concerns about [O.G.]'s mental health instability.

[O.G.]'s parents accessed and exhausted all local resources and [O.G.] later refused any care he was offered. For [O.G.] to medically stabilize, he required longer term out of home treatment as his deteriorating mental health could once again lead to a threat to himself and others. This would likely result in continued run-ins with law enforcement, potentially resulting in [O.G.] being taken into custody at a juvenile detention center, which will not provide the medical care he

needed to become mentally well. Refusal for Kaiser Colorado health insurance to not deem this severe mental illness treatment as medically necessary is not only a disservice to [O.G.] with great potential and his family. but also, to our school and the larger community. …

[O.G.]'s detrimental mental illness led to behaviors that rapidly escalating [sic] and could have resulted in serious injury or death.

42. Zachary Guzman, LCSW, wrote in a letter dated May 4, 2023:

A full report of [O.G.]'s Continuous Performance Test (administered on 12/21/2021) has been attached to this progress note.

The findings of that summary highlight extreme difficulties in the area of impulse control and sustained attention. The report was "flagged" due to the number of commission errors (42) and omission errors (26), which placed him in the 1st and 2nd percentile for his cohort (n=>125,000), respectively.

Upon review of the CPT results, additional information-gathering was conducted by Licensed Clinical Social Worker, Zachary Guzman to consider unreported variables that may have skewed test results. During this session Client O.G. admitted extensive recreational drug use as a potential factor for test result influence. At that time, a recommendation for drug rehabilitation was recommended but the client was apprehensive and minimized the concern.

Treatment interventions combined a hybrid approach of Cognitive Behavioral Therapy, Motivational Interviewing and Neurofeedback trainings to heighten awareness of the impact that recreational drug use has on the developing brain. During sessions, Client appeared very "open-minded" to learning more about the cause/effect relationship of drug use, as he reported a growing dependence on several recreational drugs.

By the client's ninth appointment, it became clear that the client had no intention of changing life-style choices that Therapist, ZG identified, as impeding any therapeutic momentum towards treatment goal achievement. A psychotic episode, involving the client running away from his home after abusing the dosage of his prescribed Seroquel medication (for sleep onset), led to a brief hospitalization at Peak View Behavioral Health, Colorado Spring, CO. After release from his mandatory 72-hour hold, the client returned to therapy and addressed significant high-risk situations that occurred while at the facility, which emphasized all the more, the client's need to address impulsivity and eliminate neurological/biological influences, like that of the client's reported persistent recreational drug use.

Efforts to attend therapy gradually waned, and soon led to O.G. refusing them altogether. By May 5th, 2022, it was determined that the client would need a

higher level of care to address the underlying cause of reported symptoms, which remained the concern since discovery (recreational drug use) and the negative impact on brain development.

43. Tony Mazzaglia, CMHC, wrote in part in a letter dated January 6, 2023:

I am a parent coach with Solutions Parenting Support and I worked with Alison and Mike [G.] from May through August of 2022. I did not ever meet with or treat their son [O.G.] but offered coaching to his parents as they tried to support his needs. We had a preventative contract with the goal of creating structure in order to support their son [O.G.] maintaining healthy functioning and wellness. The goal was also to prevent the need for a higher level of care through healthy boundaries and emotional support although [O.G.]'s receptivity to structure and past diagnoses and patterns made it unclear if he'd be willing or able to accept healthy age appropriate limits from his parents. Together we created a home plan of boundaries, and expectations as well as age appropriate incentives and consequences. We discussed how to deliver this plan to [O.G.] and implement it moving forward. We discussed and set goals around assertive communication and emotion regulation. Parents informed me that [O.G.] had a strong adverse reaction to the plan once they shared it with him. This included reported high risk behaviors and aggressive acting out. When [O.G.'s] behaviors and mental health seemed more acute than the parents and coaching strategies could support, I recommended they look for supportive care for him outside of the home. I remained in a supportive role as they looked into treatment options. Our contract ended as they found placement in a wilderness program and I stepped out of the process at that time.

44. Elizabeth Rademacher, PMHNP, wrote in part in a letter dated January 25, 2023:

[O.G.] has been under my psychiatric care since December 6th, 2022. He currently suffers from generalized anxiety disorder, binge eating disorder, panic attacks. and bipolar I disorder. It is my professional opinion that [O.G.] continues to receive care at the residential treatment facility where he currently resides at Red Mountain Colorado for continued psychiatric care in a facility setting that provides direct supervision. The risks of not having direct supervision are very high in the adolescent population with adolescents who have the diagnoses he does, with impulsivity being the highest risk in bipolar I disorder. [O.G.] needs continued daily therapeutic support in this setting to learn to manage his overall impulses to prevent relapse with substances as he has had this issue in the past. Thus, continued ongoing care at Red Mountain Colorado Residential Facility is necessary until [O.G.] has reached stabilization for his psychiatric conditions and has learned effective coping skills is necessary in my professional opinion to allow him to be a successful member in daily society independently.

45. Kevin O'Keefe, PsyD, wrote in an October 2022 psychological evaluation:

Due to the pervasiveness of his emotional struggles, behavioral issues, and difficulties making progress in treatment, he requires a higher level of care than can be provided in an outpatient setting. When he is ready for discharge from Second Nature, he would benefit from transitioning to further residential treatment that can aid him in continuing the progress he has made in the program. [O.G.] has the best of success in a structured environment and would benefit from a program that can reduce the structure he receives when he is ready for it, while still providing significant support. He would benefit most from treatment interventions that can be provided in the "here and now," to make concepts more concrete and understandable. It is crucial he is in a program with staff that can help him with building increased understanding of his patterns and build improved insight into what he is feeling before his cycles of mood/behavior in order to decrease the difficulties they can create. It will be important for [O.G.] to continue to build on the progress he has made at Second Nature and work toward implementing the therapeutic principles he has gained in his daily life.

46. Alison wrote that it was the opinion of all O.G.'s treating professionals that extended treatment at the residential level was necessary and appropriate. She voiced her concern that Beacon would attempt to supersede the opinions of the clinical professionals who had worked with O.G. on a firsthand basis and actively witnessed the deterioration of his conditions.

47. Alison wrote of the difficulties of treating individuals like O.G. who suffered from early onset bipolar disorder and argued that these individuals were likely to have additional psychiatric, neurodevelopmental, and substance use disorders. Allison wrote that O.G. was at extremely high risk of relapse and regression if he was discharged prematurely.

48. O.G.'s medical records showed that he continued to struggle with anxiety, disordered eating, depression, purging, irritability, anger issues, panic attacks, medication refusal, and refusing medical advice even while he remained in the controlled residential treatment environment.

49. Allison argued that O.G. met all of the requirements in the criteria Beacon used to evaluate his residential treatment, that he had severe functional impairments, and was at

high risk of relapse and regression which made it impossible for him to safely receive treatment at home in a community-based setting.

50. In a decision dated August 3, 2023, the external review agency upheld the denial of payment for O.G.'s treatment. The letter stated in pertinent part:

> **1. Does the member meet the provided medical policy and or criteria for coverage of residential treatment from 11/25/2022-5/26/2023? Please provide a detailed rationale as to the determination.**
>
> Based on the information provided, the patient does not meet the medical necessity criteria/InterQual criteria for residential treatment level of care from 11/25/2022 to 5/26/2023. Specifically, InterQual criteria are not met as follows:
>
> 1. Eating disorder symptoms are severe and unable to be managed at a less intensive level of care: There is no evidence that the patient's eating disorder symptoms were severe and unable to be managed at a lower level of care. There is no report of him restricting food intake or engaging in compensatory behaviors such as compulsive exercising or purging. He was not needing supervision at all meals or snacks to prevent restricting or to prevent over-exercising.
> It was noted that the patient had no significant symptoms of disordered eating patterns at the time of discharge from the wilderness therapy program.
> 2. Serious emotional disturbance with unable or unwilling to follow instructions or negotiate needs or unable to maintain behavioral control for more than 48 hours. It was noted that after participating in the wilderness therapy program for approximately three months (prior to the residential treatment), the patient showed significant improvement in regulating his emotions, mood, and was expressing his feelings appropriately. Improvements were noted in areas of mood instability, anxiety, depression, parent-child relationship, eating disorder, substance abuse, and shame and identity. He was not noted to be aggressive or unwilling to follow limits or instructions. He was not noted to have self-injurious behaviors. His environment was not noted to be abusive or high risk. He had supportive and available family. At the end of the wilderness therapy program, there is no report of psychotic symptoms, manic symptoms, or impulse control problems. He was able to abstain from substance abuse in a controlled environment and expressed willingness to continue to work on it. It was noted that he was at risk of relapsing, however, his ongoing treatment needs could be addressed in a lower level of care.
> **2. Based on the standard of care and evidence-based medicine, is the requested residential treatment from 11/25/2022-5/26/2023 medically necessary for this member? Please provide a detailed rationale as to the determination.**

Based on the information provided, requested residential treatment from 11/25/2022 to 5/26/2023 is not medically necessary for this patient. After approximately three months of out of home placement and treatment at the wilderness therapy program, the patient no longer met medical necessity criteria for residential treatment.

Per "Milieu Treatment" in Dulcan's Textbook of Child and Adolescent Psychiatry, Third Edition, many youth in need of long term placement such as residential treatment centers lack important resources, such as a supportive discharge environment and the ability to benefit from community based intensive treatment. The youth remained in residential care were those who had not responded to the range of community-based services and had no viable placement alternatives because of their higher levels of required mental health interventions. The patient was noted to have a supportive family and resources available in his environment. It was noted that he previously had inpatient psychiatric hospitalizations and an intensive outpatient program, however no indication that case management services and in home services were utilized. Discharge summary from the wilderness therapy program he attended for about three months prior to the residential treatment center (RTC) indicated that the patient displayed significant improvement in his ability to cope with frustrations.

Per Kaplan & Sadock's Concise Textbook of Clinical Psychiatry, patients in residential care have moderately severe symptoms and they can have severe functional limitations such that they cannot safely be maintained outside this setting. Goals were improvement in symptoms and functioning and return to a lower level of care.

The patient's remaining symptoms could be safely addressed in a less intensive level of care.

Per Kaplan and Sadock's Comprehensive Textbook of Psychiatry, 10th edition, Pediatric Psychopharmacology section, treating the child in the least restrictive environment should be a guiding principle of any level of care. Admission to residential care was often after extensive community-based services had been tried and exhausted. Community support can include in- home services, extended day services, and mentors or case managers. One of the home-based services is multisystemic therapy (MST), originally developed for youth with juvenile justice involvement or substance use disorders, the model has been adapted to specific needs of children with psychiatric illness and complex family and psychosocial situations.
After attending the wilderness therapy program, the patient could be transitioned to a lower level of care as of 11/25/2022 and continue treatment in a lower level of care including intensive in- home services.

51. The denial letter listed the items the reviewer had ostensibly used in their evaluation. The appeal itself is notably absent from this list however, even though it contained Plaintiff's primary arguments. If the reviewer did examine Alison's appeal along with the accompanying exhibits, they gave no indication of doing so.

52. In a letter dated January 16, 2024, Alison sent a letter, certified mail, return receipt requested, to Kaiser and the Plan Administrator. Specifically, she asked them to produce:

- Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for my son, [O.G.], at Red Mountain Colorado, copies of those individuals' *curriculum vitae*, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for [O.G.]'s claim;
- A complete copy of both the medical necessity criteria utilized by Kaiser Foundation Health Plan of Colorado and Beacon Health Options in determining that [O.G.]'s treatment was not medically necessary and that treatment for him at a lower level of care was appropriate;
- A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment. This is necessary to allow me to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;
- Copies of documents identifying the self-compliance analysis the Plan and Kaiser Foundation Health Plan of Colorado have carried out to determine the extent to which they are complying with the federal Mental Health Parity and Addiction Equity Act.
- Complete copies of any and all internal records compiled by Kaiser Foundation Health Plan of Colorado and Rocky Mountain Human Services in connection with [O.G.]'s claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications.
- A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [O.G.]'s insurance plan is operated;
- Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the plan administrator, and Kaiser Foundation Health Plan of Colorado; and
- Copies of any and all documents outlining the level of accreditation required for residential treatment programs;
- Copies of any and all documents showing whether analogous levels of care to residential treatment programs also require these levels of accreditation; and

- Copies of documents identifying the process, strategies, evidentiary standards, or other factors the Plan used to determine that the treatment at Red Mountain Colorado was experimental and investigational.
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to determine whether treatment at sub-acute inpatient programs for medical or surgical treatment is experimental and investigational.
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

53. Both Kaiser and the Plan Administrator received Alison's letter.

54. Alison did not receive a response from either Kaiser or the Plan Administrator.

55. The Plaintiff exhausted her pre-litigation appeal obligations under the terms of the Plan and ERISA.

56. The denial of benefits for O.G.'s treatment was a breach of contract and caused Alison to incur medical expenses that should have been paid by the Plan in an amount totaling over $140,000.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B) Against Kaiser, Beacon and the Plan)

57. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Kaiser and Beacon, acting as agents of the Plan, to discharge their duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

58. Kaiser, Beacon, and the Plan failed to provide coverage for O.G.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use

disorders.

59. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

60. The denial letters produced by Beacon do little to elucidate whether Beacon conducted a meaningful analysis of the plaintiff's appeals or whether it provided her with the "full and fair review" to which she is entitled.

61. Beacon failed to substantively respond to the issues presented in Alison's appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process. The external review is similarly deficient.

62. Kaiser, Beacon, and the agents of the Plan breached their fiduciary duties to O.G. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in O.G.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of O.G.'s claims.

63. The actions of Kaiser, Beacon, and the Plan in failing to provide coverage for O.G.'s medically necessary treatment violate the Plan and its medical necessity criteria.

64. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first, second, and third causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3)
### Against Kaiser, Beacon and the Plan)

65. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Kaiser and Beacon's fiduciary duties.

66. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

67. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

68. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

69. The medical necessity criteria used by Kaiser and Beacon to assess the medical necessity of the intermediate level mental health treatment at issue in this case are more stringent or

restrictive than the medical necessity criteria the Plan uses to assess the medical necessity of analogous intermediate levels of medical or surgical benefits.

70. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for O.G.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

71. When Kaiser, Beacon, and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

72. Kaiser, Beacon, and the Plan evaluated O.G.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

73. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Kaiser's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that O.G. received. Kaiser's improper use of acute inpatient medical necessity criteria is revealed in the statements in Kaiser's denial letters such as, "[y]ou were not engaging in any self-harm behaviors."

74. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that O.G. received.

75. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive benefits.

76. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

77. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

78. In addition, the level of care applied by Kaiser and Beacon failed to take into consideration the patient's safety if he returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

79. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

80. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Kaiser, as written or in

operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

81. The violations of MHPAEA by Kaiser and the Plan are breaches of fiduciary duty and give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for her loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for her loss arising out of the Defendants' violation of MHPAEA.

## THIRD CAUSE OF ACTION

### (Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c) Against the Plan Administrator)

82. Kaiser, acting as agent for the Plan Administrator, is obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan and Kaiser, the medical necessity criteria for mental health and substance abuse, and the medical necessity criteria for skilled nursing and rehabilitation facilities.

83. Alison sent a letter dated January 16, 2024, to both Kaiser and the Plan Administrator requesting documents which she was statutorily entitled to receive upon request. Kaiser and the Plan Administrator did not comply with Alison's request for documents.

84. The failure of the Plan Administrator and its agent Kaiser, to produce the documents under which the Plan was operated, as requested by the Plaintiff, within 30 days of Alison's request for ERISA documents, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this Court to impose statutory penalties up to $110 per day on the Plan Administrator from 30 days from the date of each of these letters to the date of the production of the requested documents.

85. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for O.G.'s medically necessary treatment

at RMC under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3. For an award of statutory penalties of up to $110 a day against the Plan Administrator after the first 30 days for each instance of the Plan Administrator and its agent Kaiser's failure or refusal to fulfill their duties, to provide the Plaintiff with the documents she had requested;

4. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5. For such further relief as the Court deems just and proper.

DATED this 25th day of November, 2024.

By     s/ Brian S. King
       Brian S. King
       Attorney for Plaintiff

County of Plaintiff's Residence:
El Paso County, Colorado.